FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

02 MAY 31  AM 10: 58

U.S. DISTRICT COURT
N.D. OF ALABAMA

COMMUNITY BANCSHARES, INC.,          ]
et al.,                              ]
                                     ]
        Plaintiff(s),                ]
                                     ]   CV-01-N-2835-S
        vs.                          ]
                                     ]
BRYAN A. CORR, SR., et al.,          ]
                                     ]
        Defendant(s).                ]

**Memorandum of Opinion**

ENTERED

MAY 3 1 2002

## I.    Introduction

The court has for consideration the motions to dismiss, abate, or stay of defendants "Benson[1]", "Corr[2]", Michael W. Alred, Michael A. Bean, and George Melvin Barnett. (Doc. # 28, 30, 33, 34). The motions vary in slight degree, depending upon the movant, but they each largely advance (or adopt) arguments attacking the legal, procedural, and jurisdictional sufficiency of the claims alleged by plaintiffs Community Bank, and its holding company, Community Bancshares, Inc.[3] The nature of these claims, the apparent history underlying this action, and the arguments of both the defendants and the plaintiffs are

---

[1] The Benson defendants include Dr. M. Lewis Benson, Doris E. Benson, Dr. John M. Packard, Jr., and Dr. Andy C. Mann.

[2] The Corr defendants include Bryan A. Corr, Sr., Doris J. Corr, individually and as executrix of the Estate of R. C. Corr, Jr., Tina M. Corr, and Corr, Inc., f/k/a Oneonta Telephone Company, Inc.

[3] On January 29, 2002, the plaintiffs filed a motion for leave to amend their complaint. (Doc. # 54). Since that time, the plaintiffs have submitted a second amended complaint. The court delayed its consideration of this motion while other issues occupied its consideration. (Doc. # 53, 68). With these issues resolved, and the motions to dismiss before the court, the court finds plaintiffs' motion for leave to file an amended complaint due to be and hereby **GRANTED**. The original complaint is deemed amended by the second amended complaint filed with the court.



discussed in greater detail *infra*. The court notes here that the issues have been fully briefed by the parties, and oral argument was heard on May 30, 2002. The matter now being ripe for decision, the court finds upon due consideration that the motions to dismiss are due to be denied.

### II.    Background

Community Bancshares is a Delaware corporation registered with the Federal Reserve Board as a bank holding company. Its principal place of business is Blount County, Alabama. Community Bank is an Alabama banking corporation, also holding a principal place of business in Blount County. Community Bank began operating in 1923 as The Bank of Blountsville. In 1985, two years after the formation of the Bancshares holding company (then Blountsville Bancshares, Inc.), plaintiffs assumed their current identities and began expansion efforts throughout the region. Branches were added in Oneonta, Alabama; Arab, Alabama; and soon in other small communities in north and central Alabama and Tennessee. At the time the complaint was filed, Community Bank had thirty branches and an undisclosed number of subsidiaries in the appraisal, insurance, and financing industries.

Events precipitating this lawsuit apparently began in and around the fall of 1998. In September of that year, the board of directors for Community Bancshares authorized the issuance and sale of stock valued at nine million dollars, with a selling price of $19.00 per share. One board member, Bryan A. Corr, allegedly acting with insider knowledge of the $19.00 offer, purchased approximately 31,950 shares of Community Bancshares stock at $18.00 per share and solicited a second person to purchase approximately 10,640 shares for the same price. Based upon this and other behavior, the board of directors voted to

2

remove Bryan Corr from the board in January of 1999. Shortly thereafter, the Corr family mounted a proxy challenge designed to dislodge the sitting directors and management of Community Bancshares in favor of its own slate of directors, among whom was Bryan Corr. This effort failed, as the Corr family's slate of nominees was defeated by a substantial margin at the 1999 annual meeting of shareholders. Following the annual meeting, the Corr family allegedly agreed and conspired among themselves to continue their efforts to wrest control of Community Bank from the existing management by, *inter alia*, driving down the price per share of Community Bancshares stock in the hopes of facilitating a takeover attempt and an attempt to purchase an outstanding bank stock loan.

According to the plaintiffs, the remaining named defendants joined the conspiracy over the course of the ensuing months. Defendant Michael Alred, formerly a member of the Community Bank board of directors, joined the efforts of the Corr family some time after the failed proxy challenge. Allegedly motivating Mr. Alred was a desire to obtain the positions of Chairman of the Board, Chief Executive Officer, and President of Community Bancshares (positions currently held by Kennon Patterson); as well as anger and resentment toward decisions by the bank to act as its own general contractor on several construction projects in late 1998 and early 1999. Defendants Michael Bean and George Melvin Barnett, formerly members of the Community Bank board of directors, also joined the efforts of the Corr family some time after the failed proxy challenge. Both men allegedly sought lucrative positions with the bank through their actions. Defendants Lewis Benson, Doris Benson, John Packard, and Andy Mann allegedly joined the efforts of the Corr family by filing – at the behest of Mr. Barnett – a derivative action in the Circuit Court of Marshall County, Alabama,

3

on July 21, 2000.[4] According to the plaintiffs, the defendants' purpose behind their derivative action was not to obtain the relief stated in their complaint, but to further the conspiracy to obtain control of Community Bancshares and Community Bank.

The complaint contains a Brobdingnagian number of allegations, many of which the court chooses not to recite here. In its essence, however, the complaint alleges that the defendants, led by Messrs. Alred, Barnett, and Bean, devised and implemented a scheme to soil the reputation of the bank by providing allegedly false information of financial mismanagement and impropriety to numerous sources, including state/federal banking regulators; members of the Community Bancshares board of directors; state/federal law enforcement authorities; a special committee organized by the holding corporation to investigate a separate and apparently unrelated 1998 derivative action; and others. By this scheme the defendants sought to effect a reduction in price per share of the corporate stock, ultimately permitting a takeover.

Alleged complements to these efforts were lawsuits filed by the Benson and Corr defendants, and allegedly false Schedule 13D amendments filed by the Corr defendants. According to the plaintiffs, the lawsuits[5] were not intended to obtain the relief requested,

---

[4] The action was later transferred to the Circuit Court of Blount County, Alabama.

[5] The substantive allegations of the Benson defendants' lawsuit can be reduced to the following: Community Bank and Bancshares are in the process of building two new branch offices in Alabama. Construction is underway, but the amount of work completed in no way correlates to the amount of money actually paid. Contractors performing the work have submitted false and fraudulent invoices, including invoices for work not performed. Employees and directors of Community Bank have approved and paid some of these invoices with knowledge of their falsity. Moreover, the contractors are performing the work without contracts, performance guarantees, and other commitments common in the construction industry (and if in place beneficial to Community Bank and Bancshares).

   This practice has occurred in the past during the construction of other branch offices. Moreover, these contractors are constructing a house for CEO Patterson and are underbilling him for the costs. These results arise from an agreement between the contractors and CEO Patterson whereby the contractors will construct his

4

but to discredit and weaken Community Bank, Community Bancshares, and their management, and to obtain information pertinent to the takeover effort underway. With respect to the allegedly false Schedule 13D amendments (filed in March of 2000 and March of 2002), the Corr defendants allegedly hid their conspiratorial takeover scheme by only disclosing that the group attempting to acquire control of Community Bancshares was limited to the Corr family. According to the plaintiffs, the Schedule 13D amendments should have listed all the defendants, the roles played by them, and their concerted efforts to drive down the price of Community Bancshares stock and take control of Community Bancshares.

Plaintiffs' lawsuit invokes the original and supplemental jurisdiction of this court. The lone federal law claim alleges a violation by the defendants of the securities laws through the materially false filing of two Schedule 13D amendments. As relief plaintiffs ask this court to (1) order the defendants to correct the March 2000 and March 2002 Schedule 13D amendments by fully describing the efforts and goals of the defendants with respect to their attempt to takeover Community Bancshares; and (2) enjoin the defendants from purchasing Community Bancshares stock, soliciting proxies, submitting shareholder proposals, or voting their Community Bancshares stock until an appropriate cooling-off period of not less than three years has passed. Plaintiffs state law claims include an abuse of process count, a breach of fiduciary duty count, a defamation count, and a conspiracy count. As relief

---

personal residence at a low, below-cost amount, and in return Community Bank and Bancshares will allow the contractors to work on the construction of the branch offices, and overcharge for that work.

   Similar, albeit less-detailed allegations, appear to be driving the first Corr defendants' action. The court notes, however, that this action is not styled as a derivative action. The relevance of this fact is discussed in greater detail *infra*. The second Corr lawsuit is essentially a breach of contract claim. It too is discussed in greater detail *infra*.

plaintiffs seek compensatory and punitive damages in an unspecified amount, as well as other relief this court deems just and proper.

### III.    Standard

A motion to dismiss tests the legal sufficiency of a complaint. *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997). The court may dismiss a complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). For the purpose of ruling on a 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations of the complaint. Moreover, all reasonable inferences drawn therefrom are viewed in light most favorable to the plaintiff. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n.2 (11th Cir. 2001); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Burch v. Apalachee Community Mental Health Servs.*, 840 F.2d 797, 798 (11th Cir. 1988) (en banc).

### IV.    Discussion

As noted *supra*, the defendants largely rely on the arguments advanced by the motion to dismiss, abate, or stay filed by the Benson defendants. The arguments that are unique and relevant to plaintiffs' maintenance of this action against an individual defendant (as opposed to the collective defendants) are discussed *infra* when pertinent. Before reaching those arguments, the court begins by discussing the one issue necessarily linking all the parties and this court together: plaintiffs' federal claim.

6

1. **The Williams Act Claim**

Plaintiffs' claim for injunctive relief is predicated upon an implied cause of action

recognized by the courts in the Securities and Exchange Act of 1934, as amended by the

Williams Act amendments of 1968. *See Florida Commercial Banks v. Culverhouse*, 772

F.2d 1513, 1519 (11th Cir. 1985); *see also* 15 U.S.C. § 78m(d).[6] Section 13(d) of the Williams

---

[6]Section 78m(d) of Title 15, commonly known as § 13(d) of the Williams Act, provides in pertinent part:

Reports by persons acquiring more than five per centum of certain classes of securities.
(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to[15 U.S.C. § 78l] . . . shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors –

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto . . .;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

Act requires any person who has acquired more than five percent of a class of registered equity securities, or any group of persons or entities acting for the purpose of acquiring, holding or disposing of securities, to file a Schedule 13D with the issuer, with the exchanges on which the security is traded, and with the Securities and Exchange Commission. An amended filing is due upon any material change occurring in the facts as disclosed. Section 13(d) further provides that "two or more persons act[ing] as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer . . . shall be deemed a "person" for the purposes of this subsection." 15 U.S.C. § 78m(d)(3). The Schedule 13D must disclose, *inter alia*, the identity of the person or group members, the purpose behind the acquisition of securities, and the future plans and intentions of the person or group with respect to the issuer. *See Culverhouse*, 772 F.2d at 1515; *see also Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, No. 01-7246, 2002 U.S. App. LEXIS 6771, at *9 (2d Cir. April 11, 2002). As explained by the Supreme Court:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the 'extreme care' which was taken 'to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.'"

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58-59 (1975) (citations omitted).

8

The Eleventh Circuit has twice examined the presence and scope of an implied cause of action under the Williams Act. On the first of these occasions, a three-judge panel with one judge in dissent held that § 13(d) did not provide an implied cause of action for "injunctive relief to expel an unwanted shareholder from the company." *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 560 (11th Cir. 1984). Applying the rationale as set forth in *Cort v. Ash*, 422 U.S. 66 (1975),[7] the majority found that neither the language of § 13(d) itself nor the history behind its enactment demonstrated the criteria necessary for the court to imply the type remedy sought.

> The inappropriateness of implying the remedy Liberty seeks is illustrated by an examination of the consequences that remedy would visit on existing shareholders. While section 13(d) is intended to ensure the provision of information to the market through the Commission, the exchanges and management, and it is the investors who are the intended beneficiaries of this legislation, the relief requested by the issuer, here, is at best ambiguous, even in its immediate effect on the shareholders. Requiring [divestiture] will depress the price, by increasing the supply of Liberty stock on the market without a corresponding increase in the demand. Removing voting power from [defendant] will have the effect of removing outside monitoring of management by a shareholder with significant financial interest in policing management. Thus, the divestiture remedy sought by the "issuer" illustrates only too well that the interests of shareholders and management are not likely to be identical with regard to policing schedule 13D filings.

---

[7] The panel explained that rationale as requiring it to consider:

(1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether there is any explicit or implicit indication of congressional intent to create or deny this private remedy for this plaintiff; (3) whether this private remedy for this plaintiff would be consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Libery Nat'l*, 734 F.2d at 561.

*Liberty Nat'l*, 734 F.2d at 567.  On the second occasion, a three-judge panel – again with

one judge in dissent – held that § 13(d) did provide an implied cause of action to an issuer

"to seek the remedy of corrective disclosures."  *Culverhouse*, 772 F.2d at 1519.  Again

analyzing the question under *Cort v. Ash*, the majority closely considered the potential for

harm and benefits befalling shareholders as a result of a corrective disclosure remedy in

the hands of issuers.

> In the instant case, where the particular remedy sought is corrective
> disclosures, there is no chance that shareholders will be harmed by the
> remedy. . . .  In most cases, shareholders simply cannot protect their own
> interests; they lack the resources to confirm the accuracy of information in a
> Schedule 13D of 14D-1.  The SEC simply cannot police every tender offer or
> major acquisition subject to the Williams Act.  The issuer is frequently in the
> best position to seek corrective disclosures within a time frame that will
> optimize the benefit to shareholders of such disclosures.  We conclude that
> it is necessary to grant this private right of action to issuers in order for the
> Williams Act to be effective.

*Culverhouse*, 772 F.2d at 1519.  In reaching this conclusion, the majority reaffirmed the

continuing vitality of the *Liberty National* decision:

> By providing issuers with this cause of action to enforce the Williams Act, this
> Court does not intend to allow the directors of corporations, who clearly have
> an economic interest in protecting their own positions, to use corporate
> resources simply to harass and burden aggressive outsiders.  If incumbent
> management attempts to tie up a tender offeror in litigation by unsupported
> allegations that the Schedule 13D statement of the tender offeror was false,
> courts should invoke appropriate sanctions under Rule 11 of the Federal
> Rules of Civil Procedure.  Shareholders would also have their usual remedies
> for waste.
>
> Finally, we note that the SEC (as amicus curiae) urges that *Liberty National*
> was wrongly decided . . . .  In *Liberty National*, the issuer sought a remedy,
> divestiture, that would have *harmed* the shareholders by lowering the market
> price of Liberty shares.  The harm caused by divestiture, in addition to the
> harm caused by the potential misuse of the private cause of action by
> incumbent management, clearly would outweigh the benefit that private

enforcement of the Williams Act would provide to the shareholders. Under those circumstances, this Court correctly held that the private right of action sought would be inconsistent with the purposes of the Williams Act.

*Culverhouse*, *supra* (citations omitted).

As discussed *supra*, the plaintiffs seek two types of remedies through their Williams Act claim. The first is one of corrective disclosure; namely an order that the defendants correct their March 2000 and March 2002 Schedule D amendments by fully describing the efforts and goals of the defendants with respect to their attempt to takeover Community Bancshares. By their second remedy the plaintiffs would have the court enjoin the defendants from purchasing Community Bancshares stock, soliciting proxies, submitting shareholder proposals, or voting their Community Bancshares stock until an appropriate cooling-off period of not less than three years has passed. The defendants assail these requests on several grounds.[8] The Corr defendants argue that the Williams Act does not provide a private right of action for the particular relief sought by the plaintiffs. The Benson defendants contend that the plaintiffs have failed to plead necessary requirements for both their Williams Act claim and their claim for injunctive relief. Furthermore, the Benson defendants argue that the Williams Act claim is barred by the applicable statute of limitations.

Clearly supporting the Corr defendants' argument are those admonitions by both the Supreme Court and courts of this circuit that the Williams Act is in no way intended to arm management with additional resources to fend off aggressive outsiders. *See Rondeau*, 422

---

[8] With the exception of one unique argument advanced by Mr. Barnett in his reply submission, the defendants Alred, Barnett, and Bean rely upon the submissions of the Corr and Benson defendants insofar as they attack plaintiffs' Williams Act claim.

U.S. at 58-59; *see also Culverhouse*, 772 F.2d at 1519-20.  And if the evidence ultimately demonstrates that the plaintiffs are employing their Williams Act claim in a manner inconsistent with the purpose of the statute, that claim will be due for immediate dismissal. Indeed, the plaintiffs may well find themselves facing sanctions under Rule 11 of the Federal Rules of Civil Procedure, shareholder actions seeking remedies for waste, or both.  *See Culverhouse*, 772 F.2d at 1519.  But the Corr defendants must recognize that the allegations contained in the complaint, and the role of this court on a motion to dismiss, preclude a full and complete dismissal at this juncture.  Plaintiffs allege that the "false amendments to the Schedule 13D have had and continue to have a direct, negative impact on the value of Community Bancshares's stock and upon its shareholders."  The injunctive relief sought through their Williams Act claim is the only means by which they can "restore the institutions' good names to begin to restore the value of their stock ."  These goals echo some of the very reasons offered by the *Culverhouse* majority in support of their finding of an implied cause of action under § 13(d) of the Williams Act for corrective disclosures.  *See Culverhouse, supra.*

Not surprisingly, the Corr defendants argue that any aspect of the Williams Act claim that survives their motion to dismiss should be limited in scope to the remedy of corrective disclosures.  In support of this contention, the Corr defendants observe that the plaintiffs' request for a remedy enjoining the defendants from purchasing Community Bancshares stock, soliciting proxies, submitting shareholder proposals, or voting their Community Bancshares stock until an appropriate cooling-off period of not less than three years has passed would essentially effect the same result as a court-ordered divestiture of their

12

interest in their stock. Such a remedy, the Corr defendants maintain, was explicitly rejected by the majority in *Liberty National*. *See Liberty Nat'l*, 734 F.2d at 567.

It is true that the court in *Liberty National* rejected the remedy of divestiture. This court believes, however, that *Liberty National* and the later case of *Culverhouse* do not establish a *per se* rule that the only remedy available under § 13(d) is that of corrective disclosures. As the *Culverhouse* majority explained, the particular remedy sought in *Liberty National* "would have *harmed* the shareholders by lowering the market price of Liberty shares. . . . The harm caused by divestiture, in addition to the harm caused by the potential misuse of the private cause of action by incumbent management, clearly would outweigh the benefit that private enforcement of the Williams Act would provide to the shareholders." *Culverhouse*, 772 F.2d at 1519 (citation omitted, emphasis in original). Indeed, the *Culverhouse* majority saw fit to fashion a balancing scheme to assist courts in considering whether a requested remedy advanced or undermined the purposes underlying an implied cause of action under the Williams Act.

> In deciding whether to provide the target corporation with a private cause of action under the Williams Act *to seek a particular remedy*, a court should balance the likelihood that the shareholders will benefit by obtaining necessary information, against (1) the likelihood that shareholders will be harmed by the potential misuse of the cause of action by management seeking to thwart takeover attempts, and (2) the likelihood that shareholders will be harmed by other aspects of the particular remedy sought.

*Culverhouse*, *supra* (emphasis added).

Based upon the allegations in the complaint, the court believes that any limitation on the remedies sought by plaintiffs would be premature at this time. Discovery will provide both the parties and this court with sufficient information to determine whether the remedies

13

sought are legitimate efficacies of the Williams Act, or merely veiled efforts to frustrate the aggressions of some or all of the defendants. Moreover, discovery will allow the parties to more precisely and thoroughly articulate arguments for and against the merits of a particular remedy under the *Culverhouse* balancing test discussed *supra* given the particular facts of this case. *Cf. Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1228 (4th Cir. 1980) ("[W]e subscribe to the 'accepted judicial philosophy (which) is to refrain from dismissing securities claims where it is possible that plaintiff can establish a jurisdictional basis for its claims upon completion of additional discovery.'"); *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971) ("[T]he securities acts should not be construed technically and restrictively, but 'flexibly to effectuate [their] remedial purposes.'" (quoting *S. E. C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)).

The remaining arguments are slightly more nuanced. First, the Benson defendants contend that the plaintiffs have failed to allege that the non-Corr defendants (i.e., themselves, and Messrs. Alred, Barnett, and Bean) own more than two percent of the outstanding shares of Community Bancshares stock, or crossed this two-percent threshold within the relevant twelve-month period. Without such allegations, plaintiffs' Williams Act claim fails as to the non-Corr defendants. In support of this argument, the Benson defendants direct this court to a pair of 1971 district court cases from New York and Missouri. *See Committee for New Mgmt. of Butler Aviation v. Widmark*, 335 F. Supp. 146

14

(E.D.N.Y. 1971); *Ozark Air Lines, Inc. v. Cox*, 326 F. Supp. 1113 (E.D. Mo. 1971); *see also* 15 U.S.C. § 78m(d)(6)(B).[9]

If the complaint alleged a failure on the part of the non-Corr defendants to file a Schedule 13D, the court would truly be in a position to consider the relevancy and effect of the two-percent threshold on the instant facts.  The allegations of the complaint and all reasonable inferences drawn therefrom, however, establish that the defendants, Corr and non-Corr alike, agreed to pool their voting interests and act in concert to take control of the plaintiffs.  In so doing, the defendants as a group obtained beneficial ownership of more than two percent of the outstanding shares of Community Bancshares stock.  *See Rosenberg v. XM Ventures,* 274 F.3d 137, 144 (3d Cir. 2001) (noting that the group provision in 15 U.S.C. § 78m(d)(3) "has the effect of aggregating the individual stock beneficially owned by each group member and attributing to each member the total holdings of the group."); *see also GAF Corp.*, 453 F.2d at 715-18; *see also* 17 C.F.R. § 240.13d-3(a).  Based upon these allegations, the two-percent threshold does not apply.  Furthermore, the allegations in the complaint are not that the defendants failed to file a Schedule 13D (the question presented in *Ozark Air Lines*, *supra*), but that the defendants made material omissions in the Schedule 13D amendments that were filed.  Thus, even if this court assumed *arguendo* that the two-percent threshold did apply, the court on this motion to dismiss would likely withhold judgment on the effect of the threshold, pending further

---

[9] Section 78m(d)(6)(B) of Title 15 provides:

The provisions of this subsection shall not apply to . . .
(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class.

15

consideration as to whether the defendants are estopped from invoking it. *Cf. S.E.C. v. Savoy Indus.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978) ("[S]ection 13(d) was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation, and because disclosure that is not accurate subverts this purpose, it is plain that section 13(d) requires the making of a completely truthful statement."); *GAF Corp.*, 453 F.2d at 720 ("[T]he obligation to file *truthful* statements is implicit in the obligation to file with the issuer, and *a fortiori,* the issuer has standing under section 13(d) to seek relief in the event of a false filing.").[10]

A related argument advanced by both the Benson defendants and Mr. Barnett attacks plaintiffs' pleadings and proof as failing to establish that the non-Corr defendants and the Corr defendants qualify as a group to which Williams Act disclosure obligations apply. Mr. Barnett cites the case of *Bath Industries v. Blot*, and argues that a plaintiff cannot bring a claim under § 13(d) of the Williams Act without showing that the offending parties (1) agreed as a group to pool their voting interests; (2) acted in concert to carry out a plan to take control of the issuer; and (3) acquired additional stock to carry out of such a plan. *See Bath Indus. v. Blot*, 427 F.2d 97, 108-10 (7th Cir. 1970). He contends that the plaintiffs cannot show that the defendants acquired additional stock to effectuate their plan to take control of the plaintiffs. The Benson defendants likewise cite *Bath Industries*, arguing that the plaintiffs have failed to allege any facts or raise any inferences showing that they committed any act that would support a finding that they are part of a group obligated to disclose under

---

[10] Naturally, estoppel would be appropriate only if the plaintiffs successfully proved that the non-Corr defendants acted as a group with the Corr defendants at the time the amendments were filed. But based upon the allegations, the court cannot rule out such a conclusion at this point in the proceedings.

§ 13(d). They admit that the derivative lawsuit itself could possibly give rise to an inference of group conduct, but contend that the maintenance of such a suit, regardless of motive, is the type of "legitimate cooperation" that falls beyond the scope of the Williams Act.

As a practical matter, the court notes that the three-prong test from *Bath Industries* cited by Mr. Barnett has not gone unchallenged. *See, e.g., Savoy Indus.*, 587 F.2d at 1162-63; *GAF Corp.*, 453 F.2d at 715-18.[11]  Indeed, the Second Circuit has stressed that "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). Moreover, the existence of a group is a question of fact. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001) (and cases cited).  The complaint is replete with allegations of conduct on the part of Mr. Barnett that if established as true would justify a finding that he and the others acted as a group subject to the disclosure obligations of § 13(d). With respect to the Benson defendants, the complaint alleges that they initiated the derivative lawsuit at the behest of Mr. Barnett. The complaint also alleges that they supplied documents available to them by virtue of their participation in the derivative action to Messrs. Alred and Bean, for use in a whistleblower suit currently

---

[11]As the court in *GAF Corp.* explained:

> [W]e find ourselves in disagreement with the interpretation of *Bath Industries, supra,* that the group owning more than 10%, despite its agreement to seize control, in addition, must agree to acquire more shares before the filing requirement of section 13(d) is triggered. The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of *potential changes* in control resulting from new aggregations of stockholdings and was not intended to be restricted to only individual stockholders who made future purchases and whose actions were, therefore, more apparent. It hardly can be questioned that a group holding sufficient shares can effect a takeover without purchasing a single additional share of stock.

*GAF Corp.*, 453 F.2d at 718 (citations omitted; emphasis in original).

pending against Community Bank. The court believes that these allegations give rise to a reasonable inference that the Benson defendants were acting with the other defendants as a group within the scope of § 13(d). Moreover, the court declines to foreclose this claim on the basis of either defendants' application of *Bath Industries* to the instant facts.

As noted *supra*, Mr. Barnett's application has been rejected by several courts. The Benson defendants' argument that *Bath Industries* places derivative actions beyond the scope of conduct triggering § 13(d) obligations is quite simply one of the more liberal interpretations of case language proffered to the court in some time. Certainly the commencement of a derivative action will not always require the corresponding filing or amendment of a Schedule 13D. But such commencement does not insulate the behavior of the Benson defendants from the scrutiny of this court. And given the facts as alleged, the court cannot help but find that a reasonable inference arises – given the filing of the derivative action; the allegation that it occurred at the behest of Mr. Barnett; the alleged antagonistic conduct of Mr. Barnett toward the bank; and the alleged conduct of the Benson defendants with respect to materials discovered during the course of the derivative action – that the Benson defendants are acting as part of the group of Corr and non-Corr defendants and are therefore subject to the disclosure requirements of § 13(d).[12]

---

[12]The court likewise rejects the arguments proffered by the Benson defendants in their reply brief to this court that the disclosure sought by the plaintiffs are not material as a matter of law. The plaintiffs do not seek the disclosure of controverted allegations in a complaint. Rather, they seek the disclosure that the derivative action itself was filed for an improper purpose. The court is sensitive to the fact that the securities laws do not require a shareholder to reveal the impropriety fueling a given set of actions. *See Atchley v. Qonaar Corp.*, 704 F.2d 355, 358 (7th Cir. 1983); *Arvin Indus. v. Wanandi*, 722 F. Supp. 532, 539 (S.D. Ind. 1989). "That the securities laws do not require defendants to reveal their culpability or motives does not, however, allow them to make untrue statements of material facts or fail to state material facts necessary to cure misleading statements." *Atchley*, 704 F.2d at 358. The Benson defendants candidly acknowledge that materiality is traditionally a question of fact. In the absence of controlling authority dictating an alternative result, the court declines to decide at this time that the

The Benson defendants also argue that the plaintiffs have failed to plead any of the elements necessary for injunctive relief. Specifically, they contend that the plaintiffs have failed to allege that they will suffer an irreparable injury in the absence of relief, or that they lack an adequate legal remedy at law. The Benson defendants correctly note that the Supreme Court has required plaintiffs bringing a § 13(d) claim to show "irreparable harm and other usual prerequisites for injunctive relief." *Rondeau*, 422 U.S. at 65. The plaintiffs must therefore demonstrate the violation of some legal authority by the defendants; the continuation of irreparable injury to them in the absence of an injunction; and the absence of an adequate remedy at law to be entitled to injunctive relief. *See Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982); *Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1246 (M.D. Ala. 1998), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001).

Nothing before the court precludes an award of injunctive relief. Plaintiffs have clearly alleged a violation of § 13(d). Plaintiffs have likewise alleged irreparable injury.[13] Perhaps the only allegation not set forth as clearly as it could be is the absence of an adequate remedy at law. But as the plaintiffs note in their submission to the court, claims under § 13(d) for money damages are generally rejected. *See, e.g., Hallwood Realty Partners*, 2002 U.S. App. LEXIS 6771, at *12-*23; *Culverhouse*, 772 F.2d at 1519. The court therefore finds the plaintiffs to have met their obligations in this respect.

_____

Benson defendants' alleged activities are immaterial as a matter of law.

[13] The court rejects the Benson defendants' argument that a § 13(d) disclosure cannot tell the public any more than it already knows. Resolution based on this ground – assuming it could be had – is not appropriate at this stage of the proceedings. Moreover, what the public is averred to know, as opposed to what the public might learn from a Schedule 13D disclosure, are two entirely different things whose importance and impact the court is in no position to measure at this time. Similar things can be said for the Benson defendants' position that a takeover is not "imminent."

Finally, the court rejects the Benson defendants' rather equivocal argument that the Williams Act claim is barred by the applicable statute of limitations. The plaintiffs aver that they did not learn that the defendants were acting as a group until late summer, or early fall of 2001. The complaint was filed within one year of that time, bringing the action within the purported one year statute of limitations. *See* 15 U.S.C. § 78r. If upon discovery it becomes clear that the plaintiffs had constructive notice of their claim prior to the purported time and allowed the applicable limitations period to expire, the court will permit the defendants to resubmit this argument. *Cf. Dan River*, 624 F.2d at 1228; *GAF Corp.*, 453 F.2d at 720.

## II.      The State Law Claims

The defendants offer a host of grounds in support of their position that the state law claims are due to be dismissed, abated, or stayed. Several of these claims lack merit and are readily dismissed.[14] The remaining arguments are discussed in greater detail *infra*.

### A.      The Abuse of Process Claim

The Benson defendants argue that the plaintiffs' abuse of process claim fails as to them, because the allegations in support of the claim are only that they are maintaining their derivative action for an improper purpose. Such allegations are insufficient to support a claim of abuse of process under Alabama law. The plaintiffs acknowledge the elements generally required for a claim of abuse of process, but contend that the Alabama Supreme Court has approved the applicability of the tort in situations alleging the initiation of civil lawsuits for a patently improper purpose. *See Warwick Dev. Co. v. GV Corp.*, 469 So. 2d

---

[14]For example, the court is underwhelmed by the allegations that the complaint is a shotgun pleading, thereby justifying its dismissal, or that the conspiracy allegations are so conclusory, vague and general such as to justify dismissal of the claim.

1270, 1274-75 (Ala. 1985). Moreover, they contend that the allegations in the complaint

support an abuse of process claim against Mr. Barnett, and thus against all the defendants

by virtue of their roles as co-conspirators.

As to the former point, the court agrees with the Benson defendants.   Cases both

before and after *Warwick* decision cited by the plaintiffs hold that

> [w]rongful activity designed to create a claim goes to the initiation of process,
> not to its later use. As we have said, any question about the initiation of a
> judicial proceeding is encompassed in a malicious prosecution claim, not an
> abuse of process claim. . . .  In Alabama . . . the tort of abuse of process has
> three elements: ulterior purpose, wrongful use, and malice.  Each element
> must be proven individually.

*C.C. & J. v. Hagood*, 711 So. 2d 947, 951 (Ala. 1998); *see also Wilson v. Brooks*, 369 So. 2d

1221, 1222 (Ala. 1979) ("The chief distinction between abuse of process and malicious

prosecution is that the former rests upon the improper use of a regularly issued process,

whereas the latter has to do with the wrong in the issuance of the process or in causing the

process to be issued."). Indeed, the *Hagood* court questioned the accuracy of the holding

in *Warwick* being proffered by the plaintiffs now.

> If *Warwick* stands for the proposition advanced by Hagood [that an abuse of
> process claim lies when a defendant is shown to have engaged in fraudulent
> and deceitful conduct in order to create a legal cause of action and then sues
> on that cause of action for an ulterior purpose], then *Warwick* is a
> misstatement of the law. . . . *Warwick* is further troubling because, as Justice
> Jones pointed out in his dissent, it emphasized the element of ulterior purpose
> to the exclusion of the element of a wrongful use of process.

*Hagood*, 711 So. 2d at 951. The court therefore finds that the law of Alabama does not

permit the maintenance of an abuse of process claim premised on an alleged "orchestrated

campaign to remove [plaintiffs'] senior management and the boards of directors, in part through the misuse of the judicial and criminal and regulatory processes."

This decision does not, however, warrant the dismissal of plaintiffs' abuse of process claim. As plaintiffs note in their submission, the complaint alleges that Mr. Barnett abused the process of a criminal search warrant by falsely swearing to an affidavit upon whose basis the warrant was issued. For purposes of the current motion, this allegation supports a claim for abuse of process. *See U.S. Steel, L.L.C. v. Tieco, Inc.*, 261 F.3d 1275, 1291-92 (11th Cir. 2001) (citing *Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1288 (Ala. 1993)). Furthermore, the court finds that the other defendants can be held liable for Mr. Barnett's behavior if that behavior was committed in furtherance of a conspiracy in which they participated. *See, e.g., Huckleberry v. M.C. Dixon Lumber Co.*, 503 So. 2d 1209, 1210-11 (Ala. 1987). The abuse of process claim thus remains a viable claim in this action. The claim is strictly limited, however, to those facts involving Mr. Barnett's alleged abuse of the process of a criminal search warrant, and whether such abuse was in furtherance of a conspiracy involving the remaining defendants.

**B.    State Law Claims as Compulsory Counterclaims in Other Lawsuits**

With the exception of Mr. Barnett,[15] the defendants claim that the state law claims are counterclaims that should have been brought in various other actions currently pending against the plaintiffs. The specific arguments advanced vary among the defendants, as do their merits and concerns they present.

_____

[15] Mr. Barnett has no action pending against the plaintiffs.

The Benson defendants contend that the plaintiffs' state law claims are compulsory counterclaims in their derivative lawsuit. Citing, *inter alia*, Rule 13(a) of the Alabama Rules of Civil Procedure[16] and Alabama Code § 6-5-440,[17] the Benson defendants claim that the state law claims are logically related to the claims in the derivative lawsuit and arise from the same transaction and occurrence. *Cf. Ex parte Cincinnati Ins. Cos.*, 806 So. 2d 376, 379-80 (Ala. 2001); *Alabama Ins. Guar. Ass'n v. Southern Alloy Corp.*, 782 So. 2d 203, 205-06 (Ala. 2000); *Brooks v. Peoples Nat'l Bank*, 414 So. 2d 917, 919-20 (Ala. 1982). In light of plaintiffs' failure to plead these claims in the their derivative action, the claims are due to be dismissed here.

As the plaintiffs properly observe, the Benson defendants sue as corporate representatives in the state court derivative action. *See, e.g., Leon Tempelsman & Son v. TECC Corp.*, 107 F.R.D. 384, 385 (N.D. Texas 1985); *Hardy v. Hardy*, 507 So. 2d 404, 405-06 (Ala. 1986). In the instant case, however, they are sued as individuals. Given this, the court cannot say the Benson defendants are the "same" or "opposing" party in these two actions, as those terms are used by the relevant codifications being invoked. *Cf. Akin v. PAFEC,*

---

[16] Rule 13(a) of the Alabama Rules of Civil Procedure provides in pertinent part:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

[17] Alabama Code 6-5-440 provides:

No plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party. In such a case, the defendant may require the plaintiff to elect which he will prosecute, if commenced simultaneously, and the pendency of the former is a good defense to the latter if commenced at different times.

*Ltd.*, 991 F.2d 1550, 1559 n.11 (11th Cir. 1993).[18]  Plaintiffs claims against the Benson

defendants are not compulsory counterclaims that should have been filed in their derivative

action.

The plaintiffs concede that Community Bank's state claims against Messrs. Alred and

Bean are compulsory counterclaims in the whistleblower suit currently pending in this

court. Insofar as Community Bank pleads state law claims against Messrs. Alred and Bean,

those claims are hereby dismissed. They deny, however, that Community Bancshares' state

claims are compulsory counterclaims in the same suit.  Citing the statute under which

Messrs. Alred and Bean are proceeding, the plaintiffs contend that Community Bancshares

is not and cannot be a party under said statute because it authorizes actions only against

an insured depository institution, not its holding company. *See* 12 U.S.C. 1831j.[19]

---

[18]Furthermore, the court agrees with the plaintiffs that the two direct claims contained in the derivative action fail to render the state law claims in the instant matter compulsory counterclaims as to the Benson defendants. One claim is a claim for damages against CEO Patterson and members of the boards of directors of Community Bank and Bancshares as a result of their allegedly improper refusal to permit inspection of documents. *See* Ala. Code § 10-2B-16.02.  The other claim is one alleging that the same board members abdicated their role as board members. Neither of these claims satisfy the logical relationship test necessary to establish the existence of compulsory counterclaims. *See, e.g., Brooks*, 414 So. 2d at 919.

[19]Section 1831j of title 12 provides in pertinent part:

(a) In general.
(1) Employees of depository institutions.  No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any Federal banking agency or to the Attorney General regarding--
(A) a possible violation of any law or regulation; or
(B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
by the depository institution or any director, officer, or employee of the institution.

(b) Enforcement. Any employee or former employee who believes he has been discharged or discriminated against in violation of subsection (a) may file a civil action in the appropriate United States district court before the close of the 2-year period beginning on the date of such discharge or discrimination.

24

Messrs. Alred and Bean describe plainitiffs' argument as "ludicrous."

> Did Congress intend for a holding company which owns 100% of the stock of a depository institution be exempt from a claim by an employee for retaliatory discharge or demotion?  The obvious answer is no.  Community Bancshares is just as much of an "insured depository institution" as Community Bank is.

The answer may be obvious to Messrs. Alred and Bean, as any answer uninformed by the relevant and controlling statutory language might.  But the court is bound to apply the law as written, and having reviewed the statutes applicable in the context of § 1831j actions, the court believes the plaintiffs have proffered the correct (as opposed to obvious) answer.

Community Bancshares is Delaware corporation registered with the Federal Reserve Board as a bank holding company under the Bank Holding Act of 1956.  Congress defined bank holding companies as "any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of [the Bank Holding Act]." 12 U.S.C. § 1841(a)(1).[20]  Congress also defined banks and insured depository institutions. A bank is "any national bank, State bank, and District bank, and any Federal branch and insured branch."  12 U.S.C. § 1813(a)(1)(A).  An insured depository institution is "any bank

---

[20] Section 1841(a)(1) of Title 12 provides in pertinent part:

(1) Except as provided in paragraph (5) of this subsection, "bank holding company" means any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of this Act.
(2) Any company has control over a bank or over any company if--
(A) the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company;
(B) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or
(C) the Board determines, after notice and opportunity for hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company.

Section 1813(w)(2) of Title 12, which defines the terms employed in, *inter alia*, § 1831j, incorporates this definition. *See* 12 U.S.C. § 1813(w)(2).

25

or savings association the deposits of which are insured by the [Federal Deposit Insurance]

Corporation pursuant to this Act."  12 U.S.C. § 1813(c)(1).[21]  Although it likely goes without

---

[21]Section 1813 of Title 12 provides in pertinent part:

(1) Bank.  The term "bank" –
(A) means any national bank, State bank, and District bank, and any Federal branch and insured branch;
(B) includes any former savings association that –
(i) has converted from a savings association charter; and
(ii) is a Savings Association Insurance Fund member.
(2) State bank.  The term "State bank" means any bank, banking association, trust company, savings bank, industrial bank (or similar depository institution which the Board of Directors finds to be operating substantially in the same manner as an industrial bank), or other banking institution which –
(A) is engaged in the business of receiving deposits, other than trust funds (as defined in this section); and
(B) is incorporated under the laws of any State or which is operating under the Code of Law for the District of Columbia (except a national bank),
including any cooperative bank or other unincorporated bank the deposits of which were insured by the Corporation on the day before the date of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.
(3) State.  The term "State" means any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.
(4) District bank.  The term "District bank" means any State bank operating under the Code of Law of the District of Columbia.

(b) Definition of savings associations and related terms.
(1) Savings association. The term "savings association" means –
(A) any Federal savings association;
(B) any State savings association; and
(C) any corporation (other than a bank) that the Board of Directors and the Director of the Office of Thrift Supervision jointly determine to be operating in substantially the same manner as a savings association.
. . . .
(3) State savings association. The term "State savings association" means –
(A) any building and loan association, savings and loan association, or homestead association; or
(B) any cooperative bank (other than a cooperative bank which is a State bank as defined in subsection (a)(2)),
which is organized and operating according to the laws of the State (as defined in subsection (a)(3)) in which it is chartered or organized.

. . .

(c) Definitions relating to depository institutions.
(1) Depository institution.  The term "depository institution" means any bank or savings association.
(2) Insured depository institution. The term "insured depository institution" means any bank or savings association the deposits of which are insured by the Corporation pursuant to this Act

26

saying, these definitions clearly demonstrate that an insured depository institution and a holding company are two entirely different entities.

As noted *supra*, the statute under which Messrs. Alred and Bean have sued Community Bank does not authorize actions against bank holding companies.[22] Construing this language to preclude the maintenance of a § 1831j action against Community Bancshares may seem ludicrous to Messrs. Alred and Bean, but the court sees no other option permitted by the plain language employed by Congress. *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 503 (5th Cir. 1994); *see also Walleri v. Federal Home Loan Bank*, 83 F.3d 1575, 1581-82 (9th Cir. 1996). And in the absence of any compelling reason why the court should ignore this plain language, the court will interpret and apply the statute as written. Accordingly, the court finds that Community Bancshares' state claims against Messrs. Alred and Bean are not compulsory counterclaims that should have been filed in the § 1831j action.

The final compulsory counterclaim arguments before the court are those advanced by the Corr defendants. The Corr defendants apparently initiated a lawsuit on or about September 14, 2000, in the Circuit Court of Blount County, Alabama, against, *inter alia*,

---

(3) Institutions included for certain purposes. The term "insured depository institution" includes any uninsured branch or agency of a foreign bank or a commercial lending company owned or controlled by a foreign bank for purposes of section 8 of this Act.

(4) Federal depository institution. The term "Federal depository institution" means any national bank, any Federal savings association, and any Federal branch.

(5) State depository institution. The term "State depository institution" means any State bank, any State savings association, and any insured branch which is not a Federal branch.

[22]The court rejects the argument of Messrs. Alred and Bean that the Community Bancshares is a defendant in the 1831j action because the holding company was "named . . . as a party in the 'Parties and Jurisdiction' portion of the pleading." The court has reviewed the public filings in the § 1831j action – as the parties all agree this court is capable of doing on these motions to dismiss – and notes that nothing in the record demonstrates either service of or appearance by Community Bancshares.

Community Bank and Bancshares, alleging a failure on the part of the named defendants to act fairly and provide them their due share of corporate gains (hereinafter "*Corr I*"). Approximately one month later, two of the Corr defendants – Doris Corr and the late R.C. Corr – initiated a second lawsuit in the Circuit Court of Blount County, against, *inter alia*, Community Bank and Bancshares. The claims in this lawsuit included breach of contract, tortious interference, and conspiracy (hereinafter "*Corr II*").

The Corr defendants initially argued to the court that the two state court lawsuits presented claims logically related and arising from the same transaction and occurrence as the state claims alleged in this lawsuit. When the plaintiffs responded that *Corr I* was actually a derivative suit (and that *Corr II* presented no real compulsory counterclaim issue), the Corr defendants responded by arguing that the plaintiffs' derivative suit argument had been presented to the state court in *Corr I* and rejected. The plaintiffs moved to file a surreply, claiming that the issue had not actually been decided by the state court, but continued for resolution on a motion for summary judgment. This court denied plaintiffs' motion on March 4, 2002. (Doc. # 64).[23]

Having reviewed the submissions of the parties, the court finds itself uncertain as to whether the court in *Corr I* has decided whether or not the action before it is derivative. The submissions suggest that the issue remains pending and may well have merited oral argument on two separate occasions: February of 2001 and February of 2002. In light of this, and out of comity to the Circuit Court of Blount County, Alabama, the court reserves any decision with respect to the counterclaim argument premised on the *Corr I* action until

---

[23]In retrospect, the court believes this decision was in error, and is due to be **VACATED**.

such time as the Circuit Court has issued a ruling. If the court in *Corr I* finds the action to be a derivative action, the rationale and decision set forth *supra* with respect to the Benson defendants would presumably be applicable. If the court in *Corr I* finds the action to be a direct action, this court would be inclined to find the state law claims asserted herein compulsory counterclaims that should have been brought in state court. Needless to say, this court would render either decision only after a limited period of renewed briefing.

With respect to the *Corr II* lawsuit, the court does not believe that plaintiffs' state law claims can be described as compulsory counterclaims in that lawsuit. Counterclaims are compulsory when they bear some logical relation to the claims in the original lawsuit.

> The logical relationship test denominates a counterclaim as compulsory if (1) its trial in the original action would avoid a substantial duplication of effort or (2) the original claim and the counterclaim arose out of the same aggregate core of operative facts. The claims arise from the same core of operative facts if (1) the facts taken as a whole serve as the basis for both claims or (2) the sum total of facts upon which the original claim rests creates legal rights in a party which would otherwise remain dormant.

*Brooks*, 414 So. 2d at 919 (citing *Revere Copper & Brass, Inc. v. Aetna Cas. & Sur. Co.*, 426 F.2d 709 (5th Cir. 1970)); see also *Ex parte Cincinnati Ins. Cos.*, 806 So. 2d at 379-80; *Alabama Ins. Guar. Ass'n v. Southern Alloy Corp.*, 782 So. 2d at 205-06. The facts alleged in *Corr II* are relatively straightforward. R.C. and Doris Corr entered into an agreement with Hugh Don Camp, Sr. to purchase stock. Mr. Camp subsequently breached this agreement by selling the shares to his son, Don T. Camp. The other defendants named in the action, including Community Bank and Bancshares, had knowledge of the agreement between Hugh Don Camp, Sr. and the Corrs and yet induced him to breach the agreement. These

are the essential facts serving the basis of the claims in *Corr II*. These facts do not, however, serve as the basis for the claims alleged in the instant action.

The Corr defendants' argue that the plaintiffs' claims include allegations that the *Corr II* suit itself was brought as part of the conspiracy and agreement of the entire group of defendants to seize control. Insofar as the abuse of process claim is concerned, the court would be inclined to side with the Corr defendants were it not for the decision *supra* limiting the abuse of process claim to the conduct of Mr. Barnett. *Cf. Miami Herald Pub. Co. v. Ferre*, 636 F. Supp. 970, (S.D. Fla. 1985) (holding that an abuse of process claim was a compulsory counterclaim in the original action). With this limitation in place, however, no logical relation exists between the alleged abuse of the criminal process of a search warrant by Mr. Barnett and the breach of contract action presented by *Corr II*. As for the conspiracy count itself, the court cannot say that the facts underlying it – including the allegation that the *Corr II* suit is itself in furtherance of the conspiracy – warrant the conclusion that the two claims arise from the same core of operative facts. Some relation clearly exists, but this relation is too attenuated for the court to conclude that the conspiracy claim in this action is a compulsory counterclaim in the *Corr II* action.

## V.   Conclusion

Given the rationale expressed *supra*, the court chooses to exercise its supplemental jurisdiction over the state law claims asserted here pursuant to 28 U.S.C. § 1367. Moreover, the court does not find abstention to be appropriate in this case. *Cf. Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (and cases cited). The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _30th_ of May, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE